75067, 75068. CALIFORNIA FEDERAL SAVINGS & LOAN
ASSOCIATION et al. v. HUDSON et al.; and vice versa.
(364 SE2d 582)

BANKE, Presiding Judge.

Bruce Hudson and his wife, Janie Hudson, brought suit against California Federal Savings & Loan Association ("the bank")[1] and its service corporation, Savers Investment Corporation ("the service corporation"),[2] seeking to recover damages arising from the alleged breach of a real estate development contract between Bruce Hudson and the service corporation. This contract, which pertained to certain raw land owned by the service corporation in Douglas County, Georgia, entitled the developer to 50 percent of the net profits realized from the sale of developed lots after payment of all development costs. Such compensation was not due the developer, however, "until

---

[1] California Federal Savings & Loan Association was formerly known as Peach State Federal Savings & Loan Association. Prior to that, it was known as First Federal of Bremen, and prior to that as Haralson Federal Savings & Loan Association. California Federal and any of its predecessor associations hereinafter will be collectively referred to as "the bank."

[2] California Federal's original service corporation was First Suburban Corporation. In a 1977 merger with another savings and loan association, California Federal acquired a second service corporation known as Savers Investment Corporation. First Suburban Corporation was subsequently merged into Savers Investment Corporation. Savers Investment Corporation and its predecessors will hereinafter be referred to collectively as "the service corporation."

the final sale and receipt of payment for all of the developed lots as to each separate tract of 'property' developed."

The development contract further specified that the first $200,000 earned by the developer and 50 percent of any earnings subsequently earned by him were to be pledged to the service corporation's parent company (i.e., the bank), until a total reserve of $500,000 had been accumulated. These funds were to be held by the bank as collateral until all construction loans made by the bank with respect to the lots sold pursuant to the development agreement had been paid in full. In the interim, the developer was to receive all dividends earned on the pledged funds, which, pursuant to the terms of the original agreement were to be placed in a savings account. A separate collateral pledge agreement was executed by Hudson and the bank on December 12, 1976, identifying the pledged funds by a certain specified savings account number. The latter agreement was supplemented on December 23, 1976, by a second collateral pledge agreement, which was a duplicate of the first except that it specified a different savings account number.

As previously indicated, the development contract provided that profits from the sale of developed lots would be distributed only after all the lots in each separate tract of development property were sold. However, the service corporation evidently began making payments to Hudson from the income generated by the sale of properties contained in certain of the tracts even though there were lots remaining in the tracts to be sold. The bank contends that these payments, which ultimately totalled $344,068, were "advances" which were to be repaid in the event they exceeded Hudson's share of the profits actually earned on these tracts.

The development contract was terminated in July of 1982, allegedly due to a rise in interest rates and a resulting decrease in demand for residential subdivision lots. Hudson thereafter demanded full payment of the $500,000 in earnings which, by that time, had apparently been generated by completed tracts and pledged to the bank. The bank refused this demand, taking the position that the $344,068 in "advances" which Hudson had received from the income generated by the ongoing projects exceeded his actual share of the profits in those projects by $183,690. Hudson thereupon filed the present action against the bank and the service corporation, praying for an accounting, the return of the $500,000 in pledged earnings, and a recovery of damages from the service corporation for its alleged breach of its obligations under the original development contract. Hudson's wife filed a separate action against the bank, asserting that she was a joint owner of the pledged earnings, which at some point had evidently been transferred from the savings account into a series of certificates of deposit. The service corporation filed a counterclaim in which it

sought to recover the $183,690 in excess advances which it alleged had been made to Hudson pursuant to the development contract, while the bank counterclaimed to obtain a $21,367.07 set-off against the $500,000 in pledged earnings, as compensation for certain construction loan losses it had allegedly sustained. Both the bank and the service corporation also sought damages for fraud and other alleged tortious misconduct on Hudson's part.

At the conclusion of a lengthy trial, the jury returned a special verdict specifying: (1) That the Hudsons were entitled to the return of the $500,000, plus interest on that amount at the rate of 16.5 percent annually; (2) that Hudson had received no payments to which he was not entitled; (3) that he had not engaged in any fraudulent or tortious misconduct resulting in any damage to the defendants; (4) that he was entitled to $500,000 in damages for breach of contract; and (5) that the defendants had been guilty of bad faith in the transaction, resulting in a judgment of $62,462.39 against the defendants as costs and expenses of litigation. The defendants appealed, and the plaintiffs cross-appealed, attacking the sufficiency of a supersedeas bond which the defendants were required to post pending the outcome of the appeal. *Held*:

1. Initially, we reject the plaintiffs' assertion that the defendants' appeal should be dismissed as legally insufficient on the ground that certain of their enumerations of error concern multiple rulings by the trial court, resulting in a violation of the requirement, set forth in OCGA § 5-6-40, that enumerations of error "shall set out separately each error relied upon." A dismissal of the appeal on such ground would quite clearly be contrary to the spirit and purpose of the Appellate Practice Act, which provides, in pertinent part, as follows: That "[n]o appeal shall be dismissed or its validity affected for any cause nor shall consideration of any enumerated error be refused, except: (1) For failure to file notice of appeal within the time required as provided in this article or within any extension of time granted hereunder; (2) Where the decision or judgment is not then appealable; or (3) Where the questions presented have become moot." OCGA § 5-6-48 (b). See *Contractors Mgt. Corp. v. McDowell-Kelley, Inc.*, 136 Ga. App. 116 (1) (220 SE2d 473) (1975); *MacDonald v. MacDonald*, 156 Ga. App. 565 (1) (275 SE2d 142) (1980).

2. The plaintiffs further contend that we should not address several of the defendants' challenges to the sufficiency of the evidence because these challenges were not properly preserved in the trial court. Pretermitting whether these challenges were previously asserted by the defendants by motion for directed verdict, judgment notwithstanding the verdict or new trial, they may be considered on appeal pursuant to OCGA § 5-6-36 (a), which provides that "[t]he entry of judgment on a verdict by the trial court constitutes an adju-

dication by the trial court as to the sufficiency of the evidence to sustain the verdict, affording a basis for review on appeal without further ruling by the trial court." Consequently, we proceed to the merits of the evidentiary challenges.

3. The defendants contend that the evidence does not support the award of damages against them in any amount for breach of the development contract. Pretermitting whether there was any showing that the defendants in fact breached the development contract, we must agree that there was no evidence to support an award of damages for such breach in the amount of $500,000 or in any other amount.

In support of the $500,000 award, the plaintiffs assert that they were entitled under the terms of the development contract to share in any net gain in the value of the remaining "inventory property" at the time of the termination of the contract; and they cite the testimony of the bank's former president and chief executive officer, Frank Cunningham, as evidence that the amount of that gain was $1,000,000. Cunningham's testimony in this regard was actually as follows: "Well, there was some developed lots out there, and it was some other land that the service corporation had bought for future development that hadn't been developed, and I couldn't tell you the dollar value on those because I don't have the books of the service corporation, probably around a million dollars."

This testimony proves nothing, for three reasons. First, Cunningham's estimate of the value of the inventory property was obviously speculative, there having been no showing whatever, pursuant to OCGA § 24-9-66, that he was in a position to form a correct opinion as to such value. See generally *Sisk v. Carney*, 121 Ga. App. 560, 563 (174 SE2d 456) (1970). Secondly, even if it were assumed that the remaining inventory property was worth $1,000,000 at the time of the termination of the contract, this does not establish the amount of the bank's gain on the property. Thirdly, Cunningham's testimony had reference to the value of the property on January of 1981, which was approximately 18 months prior to the June 1982 termination date, and there was no evidence of actual increase in property values during the intervening period. There being no evidence to support an award of damages to Hudson on the breach of contract claim, that portion of the judgment must be reversed.

4. The service corporation contends that the evidence established as a matter of law its entitlement to recover the $183,690 in alleged overpayments made to Hudson. This counterclaim was premised on the contention that the $344,068 which had undisputedly been paid to Hudson prior to termination of the contract were advances which were subject to repayment in the event they exceeded Hudson's actual share of the profits. Based on evidence purportedly establishing

that the total profits realized on the projects with respect to which these advances were made ultimately proved to be only $360,689, the service corporation contends that the total amount Hudson was entitled to receive on these projects was only $160,344, with the result that he was overpaid by $183,690.

Although the development contract specified that Hudson would be entitled to receive no compensation until all lots comprising each separate tract of development property had been sold, the evidence demonstrated that there had been a departure from the agreement in this regard, a departure which former bank president Cunningham testified had been initiated by the defendants after consultation with their accountants in order to minimize their tax liability. Cunningham supported Hudson's contention that these distributions were not intended to be advances but were intended as a division of the profits actually earned on the developed lots as of the distribution dates.

A mutual departure from one contractual provision does not necessarily affect the enforceability of the remaining provisions. "Whether the conduct of the parties constitutes a mutual departure from and a waiver of a contract provision ordinarily is a question of fact for the jury." *Southwest Plaster &c. Co. v. R. S. Armstrong &c. Co.*, 166 Ga. App. 373, 374 (304 SE2d 500) (1983). The evidence did not demand a recovery by the service corporation on its counterclaim.

5. The bank alleges that the evidence entitled it to a recovery as a matter of law on its claim for a set-off of $21,376.07 against the $500,000 in pledged earnings which it held as collateral. The collateral pledge agreements clearly contemplated that Hudson's share of any construction loan losses would be satisfied from the pledged collateral, and there appears to be no dispute that certain construction loans did in fact go into default. However, there was at least some evidence from which the jury could have determined that the bank did not incur a net loss as the result of these construction loan defaults because it was able to sell the properties serving as security for the loans for an amount greater than the remaining indebtedness. Accordingly, we conclude that the jury was not required to accept the bank's set-off claim.

6. We must, however, agree with the defendants that the evidence does not support the amount of prejudgment interest awarded to the plaintiffs on the pledged funds. The contractual provisions governing the accrual of interest on the pledged collateral contemplated that the funds would be placed in a savings account, with Hudson receiving the dividends earned on the funds. The evidence showed that when the amount of the pledged collateral reached $500,000, the funds were removed from the savings account and invested in a series of certificates of deposit with the bank, until, at some later point in time, the money was again placed in a savings account. While the

rates paid on the various certificates of deposit varied, they were generally higher than those offered by the bank on regular savings accounts during the same period. Indeed, there was evidence that one of the certificates of deposit had earned interest at the rate of 16.5 percent annually. It was evidently on the basis of that evidence that the jury awarded the plaintiffs prejudgment interest on the pledged collateral at the rate of 16.5 percent to be computed from December 31, 1983. However, as there is no support in the record for a conclusion that the plaintiffs were entitled to interest on the pledged collateral at such a rate throughout the entire period the collateral was held, the prejudgment interest award is vacated, and the case is remanded for a new determination of the amount of prejudgment interest to which the plaintiffs are entitled.

7. The defendants contend that there was no evidentiary support for the jury's finding that they were guilty of bad faith in the transaction. We agree. In defending the jury verdict, the plaintiffs primarily rely on evidence that the bank failed to timely enter certain interest charges on records maintained to show the accumulated income and expenditures pertaining to the various properties. While it is true that the interest charges in question were not entered until several months after they had accrued, there was no evidence to support the plaintiffs' contentions that the figures recorded were incorrect or that they were "fixed" by the bank after the litigation had begun in order to provide support for their set-off claim. Consequently, we must agree with the defendants that this evidence provides no support for an award of expenses of litigation pursuant to OCGA § 13-6-11. "Since there was no [other] evidence from which a jury could find that the contract was made in bad faith or that the [appellants] breached it as a result of some sinister motive, the award of [costs and expenses of litigation] cannot be sustained on the basis of bad faith." *Glen Restaurant v. West*, 173 Ga. App. 204, 205 (325 SE2d 781) (1984).

8. The defendants enumerate as error the denial of their motions for new trial with respect to their counterclaims for fraud and tortious misconduct. Specifically, they assert that the trial court should not have admitted into evidence certain opinion testimony offered by the bank's general counsel, E. B. Jones, which, they submit, tended to exculpate certain misconduct on Hudson's part.

In its amended counterclaim, the bank alleged that the Hudsons had conspired with others to fraudulently procure the transfer to Mrs. Hudson of a 24.5-acre parcel of land which had been paid for by the service corporation. During direct examination by the Hudsons' counsel, Jones was asked to assume that a deed had been executed to Mrs. Hudson without any knowledge or acceptance either on her part or by Mr. Hudson and was then asked to state the legal effect of such a deed. A timely objection was asserted on the ground that the ques-

tion assumed facts not in evidence, whereupon an answer was permitted subject to proof of the hypothetical facts. Mr. Jones then responded that, absent delivery of the deed, the purported transfer of title would be ineffective. A follow-up question seeking an opinion as to whether, under those same facts, the plaintiffs would "have done anything wrong" was answered by Jones in the negative. No objection was interposed to this second question; however a motion to strike Jones' testimony with specific reference to the first question was made and denied at the close of the evidence.

Subsequent to Mr. Jones' testimony, evidence was introduced showing that Cunningham had expressed a desire to acquire the 24.5-acre tract in question as a home site for his son and daughter-in-law and had sought to place the property in Hudson's name so that he (Cunningham) could later approve a bank loan on the property. There was further evidence which would support a finding that Mrs. Hudson was later named as the grantee of the property without any knowledge on her part or on her husband's part and without any delivery of the deed to her. Thus, there was evidence in the record to support the hypothetical question. See generally *Woodruff v. Naik*, 181 Ga. App. 70 (351 SE2d 233) (1986). Consequently, this enumeration of error is without merit.

9. The plaintiffs' cross-appeal, in which they assert the insufficiency of the supersedeas bond, is dismissed as moot, there having been no motion by the plaintiffs for a ruling on this issue during the pendency of the appeal.

*Judgment affirmed in part and reversed in part in case no. 75067. Appeal dismissed in case no. 75068. Carley and Benham, JJ., concur.*

DECIDED DECEMBER 3, 1987 —
REHEARING DENIED DECEMBER 17, 1987 —

G. Conley Ingram, Walter G. Elliott II, R. Wayne Thorpe, G. Michael Hartley, for appellants.
Irwin W. Stolz, Jr., Seaton D. Purdom, Donald B. Howe, Jr., John L. Coney, for appellees.